AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | )  )  Case No. |
| Metro PCS, owned by T-Mobile U.S., Inc. | )  )  **18MJ4005** |

FILED

JUL 1 3 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
As described in Attachment A-1

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:
As described in Attachment B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. Sections 1951, 924(c), and 922(g) | Hobbs Act Robbery, Possession of Firearm During Crime of Violence, and Felon in Possession of a Firearm |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew Coughlin, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  _____07/13/2018_____

_____
*Judge's signature*

City and state:  San Diego, California

Jan M. Adler, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Matthew Coughlin, being duly sworn, hereby state as follows:

### I.      INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), I have been so employed since January of 2016.  As part of my duties as an FBI Agent, I am presently assigned to the Violent Crimes Task Force and have investigated various crimes that include, but are not limited to, bank robbery, kidnapping, and possession/distribution of child pornography. As a federal agent, I am authorized to investigate violations of laws of the United States and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States

2. My experience as a Special Agent and FBI employee, my participation in a multitude of investigations, and my interactions with other agents, as other state and local law enforcement officers familiar with violent crimes, as well as my training form the basis of the opinions and conclusions set forth below, which I have drawn from the facts set forth herein. The facts are set forth in substance not verbatim, unless otherwise noted.

3.      I make this affidavit in support of an application by the United States of America for a search warrant for Metro PCS (Attachment A-1) and T-Mobile (Attachment A-2) for subscriber information, caller information, data information, and cell site location for two phone numbers that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 18, United States Code, Section 1951, Title 18, United Code, Section 924(c), and Title 18, United States Code, Section 922(g), as described in Attachments B-1 and B-2. Attachments B-1 and B-2 each describes one phone number associated with **Brittney Pena** (described herein as **Pena's Second** and **Third Phones** respectively). **Pena** was in a relationship with defendant **Lorne Turman** around the same time period that **Turman** and co-defendant **Leandre Bickham** were committing violations of federal criminal law, namely, Title 18, United States Code, Section 1951 (Hobbs Act Robbery) and Title 18, United States

Code, Section 924(c), from October 26, 2017 to December 24, 2017. The FBI believes that **Pena** was present at one robbery and may have assisted with other robberies. In addition, **Pena** appears to have coordinated with **Teysa Tabb**, **Bickham**'s girlfriend, who was also present at one or more robberies and may have assisted with other robberies.

4.     The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## II. INVESTIGATION INTO THE GRINCH BANDITS
### BACKGROUND

5.     The FBI and San Diego Sheriff's Office (SDSO) are investigating a series of commercial robberies. The robberies occurred between October 26, 2017 and December 24, 2017. In total, twelve commercial institutions were robbed on fifteen separate occasions. The robberies occurred at the following locations:

- **Godfather's Pizza**, 685 Sweetwater Road, Spring Valley, CA 91977, on October 25, 2017, November 5, 2017, and November 30, 2017;

- **Beauty Supply and Wigs**, 8300 Paradise Road, Spring Valley, CA 91977, on November 20, 2017;

- **Valero Gas Station**, 3377 Sandrock Road, San Diego, CA 92123, on November 30, 2017;

2

- **7 Eleven**, 13510 Sabre Springs Parkway, San Diego, CA 92128, on December 2, 2017;

- **KT's Donuts**, 8415 Paradise Valley Road, Spring Valley, CA 91977, on December 2, 2017;

- **Oriental Cafe**, 39 East 7th Street, National City, CA 91950, on December 3, 2017;

- **Monalava Pizza**, 500 Broadway, El Cajon, CA 92020, on December 9, 2017;

- **Wings N Things**, 528 North 2nd Street, El Cajon, CA 92021, on December 9, 2017;

- **CC and J Cargo**, 3403 E. Plaza Boulevard, National City, CA 91950, , on December 19, 2017;

- **Robinwood Market**, 5120 Robinwood Road, Bonita, CA 91902, on December 22, 2017;

- **Espana Liquor**, 9548 Jamacha Blvd, Spring Valley, CA, on December 22, 2017; and

- **Noor Clothing**, 687 Palomar St, Chula Vista, CA 91911, on December 24, 2017.

6.     The FBI suspects that at least three people, described as black males of roughly the same height, committed the aforementioned robberies.  No more than two suspects were present at any given robbery.  The FBI has identified two of the robbers: **Leandre Bickham** and **Lorne Turman**.   Where the identity of the robber is known, the robber is identified by name.  However, where the robber identities are unknown or where only one robber is known but that robber's role cannot be distinguished from an unknown robber, the robbers are described as Subject One ("S1") and Subject Two ("S2").  Use of S1 and S2 is only to distinguish one robber's acts from the other robber's acts during a given robbery described herein. The titles S1 and S2 will apply uniformly only during a

3

given robbery and will not apply uniformly throughout this application, because uniform application is not possible at present.

7.     On October 26, 2017, at approximately 6:29 PM, a subject (S1) entered **Godfather's Pizza**. Upon entering, S1 pointed a black handgun in the direction of a restaurant employee and demanded cash from the register. The employee gave S1 approximately $700. S1 fled the scene on foot. S1 was described as a male, approximately 5'6" with a medium build. S1 wore a green ski mask and a hooded sweatshirt covering his face.

8.     On November 5, 2017, at approximately 6:00 PM, a subject (S1) entered **Godfather's Pizza**. Once inside the restaurant, S1 displayed a black handgun, pointed it in the direction of two employees and demanded money from them. One employee provided S1 with approximately $150 in cash. S1 fled the scene on foot. S1 was described as a Hispanic male, approximately 20 years old, 5'7" and 150 pounds. S1 wore a gray hooded sweatshirt covering his face and blue jeans. One of the employees, who was also a victim of the October 26, 2017 robbery of **Godfather's Pizza**, believed the same individual was responsible for both robberies. In addition, based on the proximity to other robberies in this series as well as the use of pistol on the October 26, 2017 and November 20, 2017 robberies, I believe these two robberies are related. In addition, I further believe that the description of S1 being Hispanic is not dispositive because S1's face was obscured.

9.     On November 20, 2017, at approximately 4:18 PM, a subject (S1), believed to be **Turman**, entered **Beauty Supply and Wigs,** pointed a black handgun at the owner and demanded money. The owner opened the cash register and gave S1 approximately $65. S1 attempted to grab a necklace from the owner's neck but the owner screamed. When the owner screamed, a plumber working in the back of the store was alerted to the robbery. When the plumber was alerted, S1 fled the scene on foot. S1 was seen entering a gray **Volkswagen** sedan occupied by three other individuals. The individuals were described as

4

a black male, a black female and a white or Hispanic female. S1 was described as a black male wearing blue jeans and a light gray hooded sweatshirt with the words "**ARC Football**" displayed on the front. Based on the descriptions and later evidence, I believe that **Turman** fled on foot to a vehicle owned by **Pena**'s family and occupied by **Pena**, **Tabb**, and **Bickham** after he robbed **Beauty Supply and Wigs**.

10.    On November 30, 2017, at approximately 8:53 PM, **Turman** and **Bickham**, entered **Godfather's Pizza**. Upon entering **Godfather's Pizza**, **Turman** brandished a shotgun and told an employee "Don't move! Give me the money or I'll shoot you!" The employee gave **Bickahm** approximately $250.00. **Bickham** took the money and both subjects fled the scene. **Bickham** was described as a black male, approximately 6'0", 185 lbs., wearing a brown jacket, gray sweatpants and a black cover on his head. **Turman** was described as a black male, approximately 6'0" and 185 lbs. **Turman**'s face is visible in the surveillance footage. **Turman** later identified himself in surveillance footage as the individual wearing the black jacket and gray sweatpants. **Turman** confessed to committing this robbery.

11.    On November 30, 2017, at approximately 10:22 PM, **Turman** and **Bickham** entered **Valero Gas Station**. **Turman** pulled a shotgun from his pants, pointed it at the store clerk and customers and instructed them not to move or look at him. **Bickham** demanded money from the clerk; the clerk opened the register for **Bickham** and held up his hands. **Bickham** took approximately $800 in cash and both subjects fled the scene. Witnesses described **Bickham** as a black male in his early 20's, approximately 6'0". In the surveillance footage, **Bickham** was wearing gray sweatpants. Witnesses described **Turman** as a black male, approximately 5'11". **Turman** wore a dark colored jacket and covered his face. **Turman** later identified himself in surveillance footage as the individual wearing the black jacket and gray sweatpants. **Turman** confessed to committing this robbery.

5

12.    On December 2, 2017, at approximately 5:43 AM, **Turman** and **Bickham** entered **7-Eleven**. **Turman** pulled a shotgun from his pants while **Bickham** went behind the counter. **Bickham** ordered the clerk and customer present not to look at them. **Bickham** instructed the clerk to open the register drawer and ordered the customer to put his wallet on the countertop. **Turman** took the money, approximately $258, from both register drawers. **Turman** also took the customer's wallet and the customer's car keys. The subjects fled the scene. Witnesses described **Turman** as a black male, approximately 5'8" with a slim build. **Turman** wore a gray sweatshirt with the words "**ARC Football**" on the front of the sweatshirt; he had the hood positioned tightly over his face. Witnesses described **Bickham** as a black male with a slender build. **Bickham** wore all black. **Turman** later identified himself in surveillance footage as the individual wearing the gray sweater and gray sweatpants. **Turman** confessed to committing this robbery.

13.    On December 2, 2017, at approximately 6:35 AM, two subjects (S1 and S2) believed to be **Turman** and **Bickham** entered **KT's Donuts**. S1 jumped over the counter, pointed a shotgun at two employees and ordered them to the back of the kitchen. S2 also jumped over the counter and pointed a pistol at the employees. S1 then ran to the front counter and took approximately $200 from a cardboard box under the countertop. S1 also ripped a gold necklace off an employee's neck. Both subjects then exited **KT's Donuts** from an exit in the rear and fled the scene. S1 was described as a black male, in his 20's with a thin build wearing a brown or gray hooded sweatshirt with the hood over his head and with his face covered. S2 was described as a black male with a muscular build wearing a dark hooded sweater with the hood over his head and his face covered. **Turman** confessed to committing this robbery. S1 is believed to be **Bickham**. S2 is believed to be **Turman. Turman** confessed to committing this robbery.

14.    On December 3, 2017, at approximately 9:13 PM, a subject (S1) entered **Oriental Cafe.** S1 was wearing a dark sweatshirt with possibly a bandana covering his

6

face. S1 walked up to the cashier/hostess stand, pointed a long barreled firearm at an employee and said, "Give me your money!" The employee gave S1 money; S1 grabbed the money and ran out the door. The employee described S1 as a black male, approximately 6'0 to 6"2 and in his early to mid-20's. S1's identity remains unknown.

15.    On December 9, 2017, at approximately 9:41 PM, a subject (S1) entered **Monalava Pizza.** Upon entering, S1 pointed a shotgun at an employee and demanded cash from the register. The employee explained the cash register did not contain any money because the business was almost ready to close. S1 pointed the shotgun at the employee causing the employee to back away. After a brief confrontation, S1 exited the store. A witness described S1 as a black male, approximately 6'0". S1 was wearing a dark sweatshirt, a black ski mask and gloves. S1's identity remains unknown.

16.    On December 9, 2017, at approximately 10:00 PM, the two subjects (S1 and S2) entered **Wings N Things.** S1 was armed with a black shotgun. Both subjects approached the cashier and S2 demanded the cashier open the register. An employee opened the register. S2 briefly grabbed the employee while the employee opened the register. While being grabbed, the employee noticed S2 was wearing gloves. S2 began grabbing money and as he did so was instructed by S1 to "hurry up." S2 grabbed the cash register and both subjects fled. Witnesses described both subjects as black males, approximately 6'0-6'3"; both subjects wore dark colored hooded tops and black masks to cover their faces. S1's and S2's identities remain unknown.

17.    On December 12, 2017, at approximately 8:19 PM, two subjects (S1 and S2) entered **Oriental Cafe**. S1 entered **Oriental Cafe** and pretended he was there to make a purchase. Shortly thereafter, S2 entered **Oriental Cafe,** pushed a female employee toward the cash register, pointed a shotgun at her and forced her to open the cash register. S2 grabbed a large stack of cash from the register, and both subjects fled the scene. One witness described S1 as a black male in his early to mid-20's, wearing a black hooded

7

sweatshirt. The witness described S2 as a black male in his early to mid-20's, approximately 6'0 to 6'2", wearing a black hooded sweatshirt and a bandana covering his face. S1's and S2's identities remain unknown.

18.     On December 19, 2017, at approximately 7:00 PM, two subjects (S1 and S2) approached **CC and J Cargo** and confronted two female employees loading a vehicle in front of the store. S1 grabbed one of the employees, dragged her around the corner of the store, pointed a shotgun at her head and took her purse and cell phone. The purse contained approximately $1,000 in cash. S2 attempted to rob the other employee, but she locked herself in the vehicle. S2 was unable to get inside the vehicle and gave up. After robbing the employee, S1 and S2 fled the scene on foot. S1 and S2 were both described as black males wearing hooded sweatshirts. S1's and S2's identities remain unknown. One subject wore a black sweatshirt and the other was wearing a red sweatshirt.

19.     On December 22, 2017, at approximately 8:12 PM, two subjects (S1 and S2) entered **Robinwood Market**. The store clerk was standing outside of the back entrance to the store taking a smoke break. S1 and S2 walked through the store towards the clerk. S2 shouted, "Give me the money motherfucker!" S1 pointed a shotgun at the clerk, grabbed him and dragged him back into the store. S1 dragged the clerk behind the counter to the cash register. S1 and S2 demanded the clerk open the cash register. The clerk opened the cash register. S1 and S2 emptied the register. S1 and S2 also demanded money from the clerk; he gave them $300 from his pocket. S1 and S2 then fled the scene on foot. S1 was described as a black male, wearing a gray hooded sweatshirt, khaki pants and black sneakers. S2 was described as a black male, wearing a black hooded sweatshirt, black pants and gloves with blue palms. Based on cellular tower data discussed *supra* herein, **Bickham** is believed to be one of the robbers.

20.     On December 22, 2017, at approximately 8:25 PM, two subjects (S1 and S2) entered **Espana Liquor**. Upon entering, there was an employee stocking food on the shelf.

S1 pointed a shotgun at the back of the employee and then hit him on the side of his face with the end of the shotgun. After hitting the employee, S2 grabbed him and dragged him on the ground towards the back of the store. One of the subjects took the employee's phone while the other held a knife to his throat. S1 yelled "Open the register or I'll shoot you!" The employee opened the register. The subjects took cash from the register and fled the scene. S1 was described as a black male, approximately 6'0" feet and approximately 185 lbs. S1 wore a dark gray or black sweatshirt, gray or khaki pants, and black shoes. S2 was described as a black male, approximately 6'0" and approximately 180 lbs.  Based on cellular tower data discussed *supra* herein, **Bickham** is believed to be one of the robbers.

21.     On December 24, 2017, at approximately 6:14 PM, two subjects (S1 and S2) entered **Noor Clothing**. Upon entering, S1 demanded, "Where's the money?" several times while S2 pointed a shotgun at the head of an employee. S1 pushed the employee out of view of the store entrance and struck the employee twice in the mouth while demanding money. S1 then grabbed the employee and forced him to a storage room. S1 and S2 entered the storage room with the employee and hid while a customer came and left the store. After the customer left, S1 asked the employee where his cell phone (hereinafter **Noor Clothing Victim's Phone**) and wallet was. The employee told S1 his wallet was in his pocket and the **Noor Clothing Victim's Phone** was on the counter next to the cash register. The employee gave S1 his wallet and showed S1 and S2 where the **Noor Clothing Victim's Phone** was located. S1 took the **Noor Clothing Victim's Phone** and demanded the employee open the cash register. The employee opened the register and S1 took approximately $750 and placed it in his pockets. The subjects fled the scene on foot. S1 was described as a black male, approximately 24-25 years old and tall with a thin build. S1 wore a black hooded sweatshirt, black jeans and dark gloves. S2 was described as a black male who was shorter than S1 but had a thin build. S2 wore a black ski mask, gray hooded sweatshirt, black jeans and dark colored leather gloves. While fleeing the scene, the

9

subjects dropped a bag containing a shotgun. The bag and the shotgun were recovered by the El Cajon Police Department. Following the robbery, the victim provided telephone number for the **Noor Clothing Victim's Phone** to responding police officers. Based on cellular tower data, phone calls placed on the **Noor Clothing Victim's Phone** on discussed *supra* herein, and DNA results on the abandoned shotgun, **Bickham** is believed to be one of the robbers.

### INFORMATION GAINED FROM CRIME STOPPERS TIPS

22.     FBI San Diego and the SDSO obtained four tips via Crime Stoppers indicating **Lorne Turman**, also known as **Lolo**, was responsible for the robberies related to the Grinch Bandit series. **Lorne Turman** was identified as one of the robberies based on a still shot obtained from the surveillance footage obtained from **Godfather's Pizza** following the robbery on November 30, 2017. These tips were submitted on January 22, 2018, February 26, 2018, March 1, 2018, and March 19, 2018. The tips reported that **Turman** had fled to Arizona for a short time at around the time of the last robbery of **Noor Clothing** on December 24, 2017.

23.     The crime stoppers tips also reported that **Lorne Turman** was observed driving a silver **Volkswagen** Beetle, CA license plate **6YNA368** (the **Subject Vehicle**). The registration of CA license plate **6YNA368** came back to Kathryn Mendez, 1428 Palm Beach St, Chula Vista, CA 91915. Open source data base searches indicated that **Brittany Pena**, **Turman**'s girlfriend, had past associations with this address and that Kathryn Mendez is an associate of **Brittney Pena**.

24.     As noted above, a witness who was present at the robbery of **Beauty Supply and Wigs** stated that a subject entered a gray **Volkswagen** sedan after that robbery. The witness also stated that a black male, a black female, and a white or Hispanic female were also sitting in the gray Volkswagen sedan. **Brittney Pena**, **Turman**'s girlfriend, appears to be a white or Hispanic female and **Lorne Turman** appears to be a black male.

## SEARCH WARRANT EXECUTED
## AT THE RESIDENCE OF LORNE TURMAN &
## THIRD PHONE

25.     On May 9, 2018, FBI Special Agents executed federal search warrant 18MJ2275 obtained in the Southern District of California at the residence of **Lorne Turman**, 12550 Laurel Street, Lakeside, CA. During the search warrant, Special Agents found some of the clothing that matched the outfit worn by one of the robbers of Godfather's Pizza on November 30, 2017. Additionally, **Turman** was interviewed twice after agreeing to waive his Miranda rights. During the interviews, **Turman** confessed to conducting the robberies at **Godfather's Pizza** on November 30, 2017, **Valero Gas Station** on November 30, 2017, **7-Eleven** on December 2, 2017, and **KT's Donuts** on December 2, 2017. He further stated that he committed the robberies with a man who he knew as "**Grey**" and that "**Grey**" was dating **Teysa Tabb**. **Turman** also admitted that he used the **ARC Football** sweatshirt and obtained it from **Brittney Pena**. In addition, **Turman**, stated that he and "**Grey**" used **Brittney Pena**'s **Volkswagen** during a robbery.

26.     When the search warrant was executed at **Turman**'s residence, a phone associated with the phone number (619) 653-0698 was seized pursuant to that same search warrant. This phone is believed to belong to **Turman**'s mother, Jameelah Chapman. A review of this phone showed that the phone number **(619) 305-9237**,[1] **Pena's Third Phone**, was associated with a "Britt" who has a son named "Ayden." Investigators know that **Brittney Pena's** eldest son is named "Ayden." SMS messages between (619) 653-0698 and **Pena's Third Phone** indicated that it was a temporary phone used by **Brittney Pena** between the dates of November 30, 2017 to December 8, 2017. **Brittney Pena**'s boyfriend, **Turman**, confessed to committing four robberies between November 30, 2017 and December 2, 2017.

---

[1] The Service Provider for **Pena's Third Phone** is T-Mobile.

## DNA EVIDENCE

27.     Law enforcement took DNA samples obtained from the bag and shotgun left at the **Noor Clothing** robbery scene and submitted those samples to the SDSO's Department Regional Crime Laboratory. SDSO's Department Regional Crime Laboratory analyzed the samples and submitted the DNA results from the shotgun at the **Noor Clothing** robbery to Combined DNA Index System ("CODIS"), which receives lawfully obtained samples to further investigations of crimes in which the subjects remain unknown.

28.     On January 2, 2018, **Leandre Bickham**, was arrested for California Penal Code 211 (Robbery), 25850(c)(4) (Carrying a loaded firearm; unlawful possession), 12022.5(a) (Use of firearm during a felony), 30305(a)(1) (Prohibited person in possession of ammunition), 3056 (parole violation), and 148(A)(1) (Obstruct, delay a peace officer). When **Bickham** was arrested, he was in possession of a backpack containing the two cell phones and pair of gray sweatpants matching the description of those worn by one of the subjects during the robberies at **Godfather's Pizza**, **Valero Gas Station**, **7-Eleven**, and, **Monalava Pizza**. Law enforcement seized the two cell phones and sweat pants. After **Leandre Bickham**'s arrest, law enforcement obtained a search warrant to take a sample of **Leandre Bickham**'s DNA. **Leandre Bickham**'s DNA was subsequently entered into the CODIS, which matched his DNA with a DNA sample obtained from the grip of the shotgun.

29.     DNA samples were also obtained from the robberies of **Beauty Supply and Wigs**, **Wings N Things**, **Oriental Café**, and **CC & J Cargo**, and are currently being analyzed by the SDSO Regional Crime Laboratory.  In addition, the FBI obtained DNA samples from **Turman** when they executed a search warrant of his home. **Turman**'s DNA is still being analyzed.  Additional matches remain possible.

## TELEPHONE ANALYSIS

30.    Search warrants were obtained in the Southern District of California to search the cell phones found in **Leandre Bickham's** backpack (dockets 18mj1266 and 18mj1267), but the information obtained was limited to the association of MEID A100001AF523BD with a black iPhone (one of the cell phones) and the IMEI 353298075302433[2] for a rose gold iPhone (the other cell phone). Information aside from the MEID could not be obtained from the black iPhone because it appeared to be factory reset at some point. Information aside from the IMEI could not be obtained from the rose gold iPhone because it was pin locked. The United States was unable to obtain any other data stored on the cell phones, including the telephone numbers associated with the phones, contact logs, call records, text messages, or photos. It is unknown at this time what telephone numbers are associated with the cell phones.

31.    Historical records pursuant to a 2703(d) order[3] were obtained for **Noor Clothing Victim's Phone**,[4] which showed nine communications to and from **Teysa Tabb** at **(562) 305-8122** (hereinafter **Tabb's First Phone**) on December 24, 2017, the day of the

_____

[2] Due to an administrative error, this IMEI number was previously transposed as 359238060796920 by law enforcement. This error was corrected and now the IMEI number is now reported as 353298075302433.

[3] All historical cell site information contained herein was obtained in good faith prior to the U.S. Supreme Court's decision in Carpenter v. United States, Case No. 16-402 (June 22, 2018). At the time that the United States sought and obtained 2703(d) orders for cell site information, the courts had previously upheld such searches. See, e.g., United States v. Carpenter, 819 F.3d 880, 886-90 (6th Cir. 2016) (holding that seizure of historical cell site information under 2703(d) did not violate the Fourth Amendment). At least two decisions have found that the good faith exception applies to cell site information obtained using a 2703(d) order prior to the Carpenter decision being issued. See, e.g., United States v. Chavez, 2018 WL 3215914 (slip copy) (4th Cir. July 2, 2018); United States v. Chavez, 2018 WL 3145706 (slip copy) (N.D. Cal., June 26, 2018).

[4] All 2703(d) orders and information for service providers based on those orders were obtained prior to the U.S. Supreme Court's decision in United States v. Carpenter, slip opinion 16-402 (issued June 19, 2018).

Noor Clothing robbery, beginning at 6:11 p.m. and continuing after were the robbery took place. The reported time of the **Noor Clothing** robbery was at 6:14 PM. Historical records for **Noor Clothing Victim's Phone** showed that, following the robbery of **Noor Clothing**, four communications occurred with the telephone number **(213) 347-9117** (hereinafter **Tabb's Second Phone**), which was associated with **Teysa Tabb**,[5] **Bickham**'s girlfriend, and three communications occurred with telephone number **(619) 408-1235** (hereinafter **Smith's Phone**), which was associated with **Anthony Smith**,[6] who is believed to be a member of **Bickham**'s family.

32.  A 2703(d) court order was obtained for **Tabb's First Phone**. The return provided historical cell site information, but no subscriber information. TracFone Wireless, Inc. was served a grand jury subpoena for the subscriber information for **Tabb's First Phone**. TracFone Wireless, Inc. responded and indicated that **Teysa Tabb** was the subscriber of the phone. Call detail records of **Tabb's First Phone** showed 899 phone communications from December 2, 2017 to December 30, 2017 to telephone number **(818) 694-4268** (hereinafter **Bickham's Phone**), which additional investigation associated as belonging to **Bickham**.

33.  A 2703(d) order was obtained for **Bickham's Phone** from service provider Sprint. This lead to the production of historical cell site information for **Bickham's Phone** but no subscriber information as it was held by iWireless. iWireless was served a grand

---

[5] A grand jury subpoena was obtained in the Southern District of California and served to Pinger, Inc. for subscriber information and call detail records pertaining to **(213) 347 9117**. Pinger provided data that showed the username associated with the Pinger account of **Tabb's Second Phone** was **teysa.tabb1565** and the email address associated with the same account was **teysa.tabb@icloud.com**.

[6] Due to an administrative error, law enforcement previously believed that **(619) 408-1235** belonged to **Kaitlyn Foster**. This error was discovered and corrected, and law enforcement now believes this number to belong to **Anthony Smith** due to open source database indications. The FBI is waiting for results from a 2703(d) court order for **(619) 408-1235** (i.e. **Smith's Phone**).

jury subpoena for the subscriber information for **Bickham's Phone.** iWireless, Inc. responded and indicated that **Teysa Tabb** was the subscriber of the phone. The results did show, however, that **Bickham's Phone** called several of the same people contacted by **Leandre Bickham** via jail telephones. These mutual contacts included **Vanessa Smith** (**Leandre Bickham**'s grandmother), **Kaitlyn Foster** (believed to be **Leandre Bickham**'s ex-girlfriend) on telephone number **(619) 873-8479** (hereinafter **Foster's Phone**), and **Teysa Tabb** (believed to be **Leandre Bickham**'s girlfriend). **Bickham's Phone** communicated with **Tabb's First Phone** 899 times from December 2, 2017 to December 30, 2017. **Bickham's Phone** communicated with **Tabb's Second Phone** 76 times from December 2, 2017 to December 24, 2017. **Bickham's Phone** communicated with **Foster's Phone** 8 times on December 9, 2017. Additionally, **Bickham's Phone** communicated with telephone number **(619) 719-8208** (hereinafter **Pena's First Phone**), which belongs to **Turman**'s girlfriend, **Brittney Pena,** 260 times from December 10, 2017 to December 27, 2017.

34.     A 2703(d) order was obtained for **Pena's First Phone,** which confirmed **Brittney Pena** is the subscriber. The historical data for **Pena's First Phone** is still being analyzed, but a preliminary analysis confirms that **Pena's First Phone** was used to communicate with **Bickham's Phone** 260 times. The call detail records of **Tabb's First Phone** also show that there were approximately 133 communications between **Tabb's First Phone** and **619-608-4934**, **Pena's Second Phone**,[7] from January 4, 2018 (two days after **Bickham**'s arrest) to January 10, 2018. Current telephone analysis does not show communications between these two telephone numbers prior **Bickham**'s arrest or after January 10, 2018.

_____

[7] Phone number, (619) 608-4934 was linked to a Facebook page belonging to Facebook user "Brittney Nicole." Based on the Facebook photos, it is believed that this Facebook page belongs to Brittney Pena. The Service Provider for **Pena's Second Phone** is Metro PCS.

15

35.    Additionally, a review of the 2703(d) data obtained from **Bickham's Phone** showed 179 communications with **Pena's Third Phone** on from December 1, 2017 to December 8, 2017.  This included multiple text messages sent and received during the days of the robberies of **Godfather's Pizza** and **Valero Gas Station** on November 30, 2017 and **7 Eleven** and **KT's Donuts** on December 2, 2017 . Furthermore, a review of the 2703(d) data obtained from **Tabb's First Phone** showed 70 communications with **Pena's Third Phone** from December 2, 2018 to December 8, 2018. This included multiple text messages sent and received during the day of the robbery of **7 Eleven** and **KT's Donuts** on December 2, 2017.

### Historical Cell Phone Data Analysis
### Specific to the Robberies of Robinwood Market and Espana Liquor
### on December 22, 2017

36.    The subscriber information and historical cell phone data for **Bickham's Phone** shows the following:

- **Bickham's Phone**  received communications during the following times on December 22, 2017 using a cell tower located in the vicinity of **Robinwood Market,** which reported a robbery taking place 8:12 PM:
  - 7:57 PM
  - 8:07 PM

- **Bickham's Phone** received communications during the following times on December 22, 2017 using a cell tower located in the vicinity of **Espana Liquor,** which reported a robbery at 8:25 PM:
  - 8:15 PM
  - 8:18 PM
  - 8:20 PM
  - 8:23 PM

16

37.   Based on the above, **Leandre Bickham**, as user of **Bickham's Phone**, appears to have been present in the same area as **Robinwood Market** and **Espana Liquor** during the times of their robberies on December 22, 2017.

### Historical Cell Phone Data Analysis
### Specific to the Robbery of Noor Clothing on December 24, 2017

38.   The subscriber information and historical cell phone data for **Noor Clothing Victim's Phone, Tabb's First Phone, Bickham's Phone**, and **Smith's Phone**, show the following:

- **Bickham's Phone** received a communication on December 24, 2017 at 6:13 PM using a cell tower in the vicinity of **Noor Clothing**, which reported a robbery occurring at 6:14 PM.

- **Noor Clothing Victim's Phone** sent or received communications from the following telephone numbers during the following times on December 24, 2017 using a cell tower located in the vicinity of **Noor Clothing**:

  o **Tabb's First Phone** at 6:11 PM
  o **Tabb's First Phone** at 6:20 PM
  o **Tabb's Second Phone** at 6:34 PM
  o **Smith's Phone** at 6:35 PM
  o **Smith's Phone** at 6:41 PM
  o **Tabb's Second Phone** at 6:42 PM
  o **Smith's Phone** at 6:47 PM
  o **Tabb's Second Phone** at 6:48 PM

- **Noor Clothing Victim's Phone's** sent or received communications from the following telephone numbers during the following times on December 24, 2017 using a cell tower located approximately two miles North of **Noor Clothing**:

  o **Tabb's Second Phone** (believed to be **Tabb**) at 7:15 PM

17

- o **Tabb's First Phone** (believed to be **Tabb**) at 7:16 PM
- **Noor Clothing Victim's Phone** sent or received communications from the following telephone numbers during the following times on December 24, 2017 using various cell towers located East of Interstate 805 and South of Interstate 8 in San Diego County:
  - o **Tabb's First Phone** at 7:21 PM
  - o **Tabb's First Phone** at 7:24 PM
  - o **Tabb's First Phone** at 8:52 PM
  - o **Tabb's First Phone** at 8:52 PM
- **Noor Clothing Victim's Phone** sent or received communications from the following telephone numbers during the following times on December 24, 2017 using a cell tower located in the vicinity of El Cajon, CA 92021:
  - o **Tabb's First Phone** at 8:52 PM
  - o **Tabb's First Phone** at 8:52 PM
- **Tabb's First Phone** sent or received communications from the following telephone numbers during the following times on December 24, 2017 using a cell tower located in the vicinity of El Cajon, CA 92021:
  - o **Noor Clothing Victim's Phone** at 6:12 PM
  - o **Noor Clothing Victim's Phone** at 6:14 PM
- **Tabb's First Phone** sent or received communications on December 24, 2017 between 6:15 PM and 6:24 PM, including one communication with **Smiths's Phone**, using various cell towers located East of Interstate 805 and South of Interstate 8 in San Diego County.
- **Tabb's First Phone** conducted one communication on December 24, 2017 at 7:07 PM using a cell tower located approximately 2 miles North of **Noor Clothing**.

- **Tabb's First Phone** sent or received several communications on December 24, 2017 between 7:16 PM and 8:04 PM using various cells towers located East of Interstate 805 and South of Interstate 8 in San Diego County and a cell tower in the vicinity of El Cajon, CA 92021.

39.   Based on the above, **Leandre Bickham**, as user of **Bickham's Phone**, appears to have been present in the same area as **Noor Clothing** when the December 24, 2017 robbery took place.  The calling history for **Noor Clothing Victim's Phone** also indicates that **Bickham** was the likely user of the phone and that **Tabb** assisted **Bickham** after the robbery took place.

### IV.   Basis For Evidence Sought in Search Warrant

40.   Based on the above investigation, and my training, experience, and consultation with other law officers regarding robberies and other violent crimes:

41.   Two individuals coordinating a robbery will utilize cell phones to arrange meeting times and locations and otherwise discuss the logistics of the robbery.

42.   Individuals involved in robberies and other violent crimes who are working in concert with each other often communicate using cellular telephones to plan and carry out robberies.

43.   Individuals involved in robberies and other violent crime use cellular telephones to increase their mobility and coordinate illicit activity, through traditional audio conversations, emails, social media, and other electronic applications. Individuals involved in robberies may utilize web or social media searches related to robbery targets, travel to and from their robbery targets, searches related to methods or techniques for robbery, searches related to possible safety measures at their robbery targets, and searches made after the robberies related to law enforcement investigations into the robberies. Data usage on phones to access the web, social media, or other applications will be captured by cellular towers and provide insight as to co-conspirator locations.

44.     Through training and conversations with other special agents and experts, I have learned cellular service providers store locations and/or GPS information based on cellular phones using a cellular phone tower for service.  Analyzing records for which cellular phones accessed certain cellular phone towers near a specific location, such as the scene of a robbery or the residence of a co-conspirator, can help identify suspects who were using their cellular phones to coordinate a robbery.

45.     Based on the above, on the history of communications between the subjects set forth in this affidavit, on the belief that **Leandre Bickham** was in the vicinity of **Robinwood Market**, **Espana Liquor**, and **Noor Clothing** during the times of their robberies, on the presence of **Bickham**'s DNA on the shotgun left at the robbery of **Noor Clothing**, on **Lorne Turman**'s admissions, and on a witness' statement regarding the presence of four individuals matching the description of **Bickham**, **Turman**, **Teysa Tabb**, and **Brittney Pena** at the scene of the **Beauty Supply and Wig** robbery, cellular phone records for **Pena's Second** and **Third Phones**—including subscriber, call log, and location information when the cellular phone was active before, during, and after the dates and times of the robberies related to the Grinch Bandit series—will reveal pertinent information about the robberies.

## VI. PRIOR ATTEMPTS TO OBTAIN DATA

46.     The United States has attempted to obtain the requested data for **Brittney Pena's Second Phone** from a previous 2703(d) Court Order obtained in the Southern District of California.  However, the United States is now seeking this search warrant for historical cell records, including cell site information, based on the U.S. Supreme Court's decision in Carpenter v. United States, Case No. 16-402 (June 22, 2018).

## VII. REQUEST FOR SEALING AND PRECLUSION OF NOTICE

47.     This is an ongoing investigation of which the target, particularly **Brittney Pena**, is unaware.  It is very likely, based upon the above, that evidence of the crimes

under investigation exists on computers subject to the control of the targets. There is reason to believe, based on the above, that premature disclosure of the existence of the warrant will result in destruction or tampering with that evidence and seriously jeopardize the success of the investigation. Accordingly, it is requested that this warrant and its related materials be sealed until further order of the Court. In addition, pursuant to Title 18, United States Code, Section 2705(b), it is requested that this Court order the electronic service provider to whom this warrant is directed not to notify anyone of the existence of this warrant, other than its personnel essential to compliance with the execution of this warrant, until September 6, 2018, absent further order of the court.

## VIII. <u>CONCLUSION</u>

48.    Based on the foregoing, I believe there is probable cause to believe items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 18, United Code, Section 1951, Title 18, United Code, Section 924(c), and Title 18, United Code, Section 922(g), as described in Attachments B-1 and B-2, will be found at the properties to be searched, as provided in Attachments A-1 and A-2.

_____
Matthew Coughlin
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this ___13th___ day of July, 2018

_____
Hon. Jan M. Adler
United States Magistrate Judge

21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## ATTACHMENT A-1

## PROPERTY/ITEMS TO BE SEARCHED

The business known **Metro PCS**, owned by **T-Mobile U.S., Inc.,** located at the office of the **Custodian of Records, 4 Sylvan Way, Parsippany NJ 07054, and email address of LERInbound@T-Mobile.com.**

1

### ATTACHMENT B-1

### PROPERTY/ITEMS TO BE SEARCHED/SEIZED

**I.    Service of Warrant**

The officer executing the warrant shall permit Metro PCS as custodian of the records described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.    "Metro PCS" Items subject to seizure**

All Metro PCS records for cellular number **619-608-4934 ("Pena's Second Phone")**, from October 26, 2017 to present, to include:

1.    Published and non-published subscriber information for the **Pena's Second Phone** to include subscriber name; address; call detail records; length of service (including start date) and types of service utilized; telephone or instrument number or other subscriber number or identity; and means and source of payment for such service (including any credit card or bank account number) from.;

2.    Call Detail Records (CDRs)/Mediations Report to include Cell Site locations and Sectors for ALL outgoing and incoming Voice, SMS, MMS, and Data transactions, ALL available True Call Reports, to include cell site, sector, and distance from tower, IP session, and data, and ALL available Mobile Data Session and IPv6 reports for **Pena's Second Phone**;

3. A certification pursuant to Federal Rules of Evidence 803(6) and 902(11) and 28 U.S.C. § 1746 from a records custodian, or other person with knowledge of such information, attesting to the authenticity of the produced records and certifying, to the extent true, that the records produced along with the certification were (1) made at or near the time of the occurrence of the matters set forth in the records, by, or from information transmitted by, a person with knowledge of those matters; (2) were kept in the course of regularly conducted business activity; and (3) were made by the regularly conducted business activity as a regular practice.

1

1   which are evidence of violations of Title 18, United States Code Sections 1951

2   (Hobbs Act Robbery), 924(c) (Possession of Firearm in Furtherance of a Crime

3   of Violence), and 922(g) (Prohibited Person in Possession of a Firearm).

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27